COURT OF APPEALS OF VIRGINIA

Present:  Judges Humphreys, McClanahan and Senior Judge Willis
Argued at Chesapeake, Virginia

ALTON NELSON WILDER

                                                        OPINION BY
v.      Record No. 2785-08-1                 JUDGE ROBERT J. HUMPHREYS
                                                        JANUARY 19, 2010
COMMONWEALTH OF VIRGINIA

                FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                          Walter J. Ford, Judge Designate

                Lenita J. Ellis for appellant.

                Virginia B. Theisen, Senior Assistant Attorney General
                (William C. Mims, Attorney General, on brief), for appellee.


        Alton Nelson Wilder ("Wilder") appeals his conviction for grand larceny, in violation of

Code § 18.2-95.  On appeal, Wilder contends that the trial court erred in admitting a 911 tape

recording into evidence, claiming that (1) the tape recording was inadmissible hearsay and (2) its

admission violated his Sixth Amendment right to confrontation.  Wilder further contends that the

evidence adduced at trial was insufficient to sustain his conviction.  For the following reasons,

we disagree with Wilder's first contention but agree with his second contention, and we,

therefore, reverse his conviction.

                                        BACKGROUND

        "'On appeal, we construe the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom.'"  Caison v. Commonwealth,

52 Va. App. 423, 428, 663 S.E.2d 553, 555 (2008) (quoting Zoretic v. Commonwealth, 13

Va. App. 241, 242, 409 S.E.2d 832, 833 (1991)).  So viewed, the evidence established the

following.

Around 7:20 p.m. on November 12, 2007, the Norfolk police received a 911 call from Joe Madison ("Madison"), a homeless man who slept in the woods behind a stockyard owned by B&H Sales Corporation. The stockyard was located on Hampton Boulevard in the City of Norfolk. The exchange between Madison and the dispatch operator was as follows:

[Operator]: Norfolk 911, what is your emergency?

[Madison]: I saw two guys break into this company, B&H Concrete, over here on 24th and Hampton Boulevard. They are pushing a -- what do you call it -- dumpster things full of material which they stole when they broke inside the fence over here, so I'm going to have -- they are en route to Lambert's Point down 25th Street. If the police was to come right now, they would -- because that can's mighty heavy. They struggling [sic] with it.

[Operator]: Okay. You're talking to -- what is that?

[Madison]: That's D&H --

[Operator]: D&H Concrete?

[Madison]: Right. Uh-huh.

[Operator]: And they are trying to push a bin away?

[Madison]: Yeah. Un-huh. They came up here with a been [sic] from somewhere.

[Operator]: Uh-huh.

[Madison]: They broke in -- they got this gate back here in the very back.

[Operator]: Two black males?

[Madison]: Huh?

[Operator]: Is it two males?

[Madison]: Yes, it's two males. One is wearing yellow – like, a, yellow shirt, blue jeans. The other one looks like he's wearing a checkered -- a black, like, checkered, and he might have had blue jeans. They looked, didn't see me, because I sleep back here in the woods.

[Operator]: All right. The second one is wearing the checkered shirt?

[Madison]: Looks like a checkered wooly-like type.

[Operator]: Oh, a checkered, like, a flannel jacket?

[Madison]: Yeah. Yeah, black, and, like, his pants might have been black or blue jeans. And if they respond now, they will probably catch them because, like I said, that cart has to be mighty heavy. Because I mean, they were just going any --

[Operator]: Which way are they walking?

[Madison]: They are walking, like, towards Lambert's Point itself. After, like, you turn off on 27th Street over there by the storage unit.

[Operator]: Um-hmm.

[Madison]: Okay.

[Operator]: All right. Would you care to leave your name or anything?

[Madison]: Well, my name is Joe Madison. I called the company and left my name with them also, but, you know, it's an answering service.

[Operator]: Okay. Mr. Madison, we have police responding.

[Madison]: Okay. Thank you.

[Operator]: Uh-huh. Bye bye.

Shortly thereafter, Officer J.L. Matthews ("Matthews") and Detective Eddie Rodriguez ("Rodriguez") of the Norfolk Police Department received a dispatch regarding a theft at a business in the 2400 block of Hampton Boulevard. The dispatch gave a description of the two individuals who were suspected in the theft: "one of the individuals was wearing a yellow shirt with jeans, and the other individual was wearing a checkered-like flannel shirt with jeans." Matthews and Rodriguez were in the area at the time of the dispatch and responded. Just a few

blocks from the stockyard, Matthews and Rodriguez observed two men matching the description given in the dispatch. One of the men was Wilder.

Wilder was wearing a yellow jacket with blue pants, and the other man ("Brooks") was wearing a dark flannel jacket and dark jeans. Matthews testified that Wilder and Brooks were pushing a "big bucket-type container" down the street.[1] Before Matthews and Rodriguez got out of their vehicle, Wilder and Brooks "split off" from each other. Matthews approached Wilder and began to question him. Wilder stated that "he didn't do anything illegal" and that "[h]e was just coming from the junkyard around the corner with his friend." Rodriguez looked inside the container and observed several large metal, "machinery-type" objects.

Earl Coleman ("Coleman"), the owner of B&H Sales Corporation, was able to identify the objects found in the container pushed by Wilder and Brooks. Coleman testified that the objects belonged to his tenant, General Dynamics, and that prior to November 12, those objects were sitting beside the office building on Coleman's property. Coleman also testified that, on November 12, a gate on the property, in close proximity to the stolen objects, was broken and "swung outward." Coleman estimated that there was "400 pounds worth of stuff in the [container]."

Bruce Johnson ("Johnson"), a facilities manager for General Dynamics, also testified on behalf of the Commonwealth. Johnson identified the stolen objects found in the container as a spotlight from a navy ship, an L-shaped cooling coil, an electric motor, and a sump pump. Johnson testified that General Dynamics was in the process of refurbishing these items so that they could be reinstalled on Navy ships. Johnson testified that the combined value of these objects was approximately $3,900.

---

[1] Wilder had his arm in a sling due to a recent shoulder injury. However, Matthews testified that Wilder was pushing the container with his free arm.

Wilder testified on his own behalf.[2]  He claimed that, on November 12, 2007, he was on his way home from the pharmacy when he ran into Brooks pushing a large container.  According to Wilder, Brooks offered to pay him $20 if Wilder would present his I.D. at the junkyard once they got there.  Wilder agreed.  However, the junkyard was closed, and they were unable to sell the objects in the container.  Wilder testified that he did not know Brooks had stolen the objects and that he never touched the container.

Prior to trial, Wilder made a motion to suppress the 911 tape recording.  Wilder argued that the recording was inadmissible hearsay, and, in the alternative, that its admission violated his Sixth Amendment right to confrontation under Crawford v. Washington, 541 U.S. 36 (2004).  The trial court overruled Wilder's motion and admitted the recording.[3]  At the conclusion of the Commonwealth's case-in-chief, Wilder made a motion to strike the evidence, arguing that the Commonwealth failed to prove that he took the stolen property and that the value of the stolen property exceeded $200.  However, Wilder failed to renew his motion to strike after all the evidence was presented.  Ultimately, a jury convicted Wilder of grand larceny.  Wilder now appeals to this Court.

---

[2] Wilder acknowledged during direct examination that he had previously been convicted of perjury.

[3] The trial court never explained its rationale for admitting the 911 tape recording. Following the arguments of both counsel, the trial court simply stated:  "I think the evidence is proper.  I overrule your motion."

ANALYSIS

I. <u>Hearsay</u>[4]

Wilder argues that the trial court abused its discretion in admitting the 911 tape recording into evidence because the statements contained in the recording constituted inadmissible hearsay that did not fall within any recognized exception to the hearsay rule. We disagree.

"Hearsay is a statement, other than one made by the declarant while testifying at trial, which is offered to prove the truth of the matter asserted." <u>Clark v. Commonwealth</u>, 14 Va. App. 1068, 1070, 421 S.E.2d 28, 30 (1992). "'As a general rule, hearsay evidence is incompetent and inadmissible,' and 'the party seeking to rely upon an exception to the hearsay rule has the burden of establishing admissibility.'" <u>Caison</u>, 52 Va. App. at 431, 663 S.E.2d at 557 (quoting <u>Neal v. Commonwealth</u>, 15 Va. App. 416, 420-21, 425 S.E.2d 521, 524 (1992)). However, Virginia recognizes several exceptions to this general rule. <u>Clark</u>, 14 Va. App. at 1070, 421 S.E.2d at 30. One such exception involves "present sense impression[s]," which are "statement[s] accompanying and characterizing an act . . . ." <u>Id.</u>; <u>see also</u> Charles E. Friend, <u>The Law of Evidence in Virginia</u> § 18-20, at 798-99 (6th ed. 2003). In order for the present sense impression exception to apply, three requirements must be satisfied: "(1) the declaration must have been contemporaneous with the act; (2) it must explain the act; and (3) it must be spontaneous." <u>Clark</u>, 14 Va. App. at 1070, 421 S.E.2d at 30.

We hold that the statements contained in the 911 tape recording satisfy all three requirements of the present sense impression exception to the hearsay rule. In the tape recording, Madison stated that "*they are pushing* a -- what do you call it -- dumpster things full

---

[4] We first address the evidentiary issue raised regarding the admissibility of the out-of-court statement because of the principle that appellate courts "do not reach constitutional issues in the absence of the necessity of deciding them." <u>Three Affiliated Tribes v. Wold Engineering</u>, 467 U.S. 138 (1984); <u>see also</u> <u>D'Ambrosio v. D'Ambrosio</u>, 45 Va. App. 323, 341 n.3, 610 S.E.2d 876, 885 n.3 (2005).

of material . . . . They struggling [sic] with it." (Emphasis added). Madison also stated that "*they are en route* to Lambert's Point down 25th Street." (Emphasis added). In addition, Madison described what Wilder and Brooks were wearing at the time: "*One is wearing* yellow – like, a, yellow shirt, blue jeans. The other one looks like *he's wearing* a checkered -- a black, like, checkered, and he might have had blue jeans." (Emphasis added). Because they were made in the present tense, it is clear that these statements accompanied the acts they described, satisfying the contemporaneous requirement of the present sense impression exception.

Nevertheless, Wilder argues that Madison "was describing a past crime" and that "[h]is comments did not have the indicia of truth to get past [his] hearsay objection." While it is true that some of Madison's statements described past events, that fact, by itself, does not render the present sense impression exception inapplicable. "The 'circumstantial guarantee of trustworthiness' of this exception is found in the contemporaneousness and spontaneousness of such statements." Friend, supra, § 18-20, at 798. "'The trustworthiness of the assertion arises from its timing. The requirement of contemporaneousness, *or near contemporaneousness*, reduces the chance of premeditated prevarication or loss of memory.'" Foley v. Commonwealth, 8 Va. App. 149, 161-62, 379 S.E.2d 915, 922, aff'd on reh'g en banc, 9 Va. App. 175, 384 S.E.2d 813 (1989) (quoting Booth v. State, 508 A.2d 976, 980 (Md. 1986)) (emphasis added). Contrary to Wilder's contention, from the facts in the record, the trial court could have properly concluded that the statements contained in the tape recording were made contemporaneously or near contemporaneously with the acts they describe.

The remaining requirements of the present sense impression exception are also satisfied. First, it is clear from the record that Madison's statements in the tape recording explained the act he was observing. Madison was able to describe, in detail, what Wilder and Brooks were doing, what they were wearing at the time, and in what direction they were headed. The record also

demonstrates that Madison's statements in the 911 tape recording were made spontaneously. A spontaneous declaration is "[a] statement that is made without time to reflect or fabricate and is related to the circumstances of the perceived occurrence." Black's Law Dictionary 1438 (8th ed. 2004). Here Madison called the Norfolk emergency dispatch to report a crime in progress. His statements described the actions of the perpetrators as they were happening, without time for reflection or fabrication. Thus, we hold the statements contained in the 911 tape recording satisfy the requirements of the present sense impression exception to the hearsay rule and the trial court did not err in admitting them on that basis.

## II. Confrontation Clause

In the alternative, Wilder contends that the 911 tape recording constituted "testimonial hearsay," and thus violated his Sixth Amendment right to confrontation under the United States Supreme Court's analysis in Crawford v. Washington, 541 U.S. 36 (2004), and its progeny, Davis v. Washington, 547 U.S. 813 (2006). "[W]e review *de novo* whether a particular category of proffered evidence is 'testimonial hearsay.'" Caison, 52 Va. App. at 434, 663 S.E.2d at 559 (quoting Jasper v. Commonwealth, 49 Va. App. 749, 755, 644 S.E.2d 406, 409 (2007)).

"The Confrontation Clause of the Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" Davis, 547 U.S. at 821 (quoting U.S. Const. amend. VI). However, the United States Supreme Court has made clear that a defendant's right to confrontation only applies to testimonial hearsay because only those statements that are "testimonial" in nature "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." Id. In Davis, "the Supreme Court considered whether an interrogation that occurred during a 911 call produced testimonial statements." United States v. Proctor, 505 F.3d 366, 371 (5th Cir. 2007). In its

- 8 -

attempt to explain the distinction between statements that were testimonial and those that were nontestimonial, the Supreme Court stated:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis, 547 U.S. at 822.

Using this definition, the Supreme Court concluded that the 911 call was nontestimonial "[b]ecause the caller was not acting as a witness, but rather, was 'enabl[ing] police assistance to meet an ongoing emergency.'" Caison, 52 Va. App. at 436, 663 S.E.2d at 559 (quoting Davis, 547 U.S. at 828). However, as is so often the case, when the Supreme Court answers one question, it creates others with which lower courts must grapple. Indeed, Justice Thomas envisioned the confusion that Davis would cause when he stated that the primary purpose test was an "unpredictable test" that would be "difficult for courts to apply . . . ." 547 U.S. at 834 (Thomas, J., concurring in part and dissenting in part).

That said, the case before us requires us to discern what the Supreme Court meant when it used the words "ongoing emergency." To answer that question, we look to the factors the Supreme Court considered in reaching its conclusion in Davis, which can be summarized as follows:

> (1) Was the declarant speaking about current events as they were actually happening, "requiring police assistance" rather than describing past events?
>
> (2) Would a "reasonable listener" conclude that the declarant was facing an ongoing emergency that called for [immediate] help?
>
> (3) Was the nature of what was asked and answered during the course of a 911 call such that, "viewed objectively, the elicited

- 9 -

statements were necessary to be able to resolve the present emergency" rather than "simply to learn . . . what had happened in the past?"

(4) What was the "level of formality" of the interview? For example, was the caller frantic, in an environment that was neither tranquil nor safe?

United States v. Cadieux, 500 F.3d 37, 41 (1st Cir. 2007).[5]

The Attorney General argues that any ongoing felony constitutes an "emergency" for the purposes of any analysis under Davis. However, it seems to us that if the Supreme Court intended that conclusion, it would simply have said as much, rather than promulgate the more complex analysis of the four factors recited above. We, therefore, decline the Attorney General's invitation to read Davis so expansively.

Viewing the facts of this case in light of the framework provided by Davis, we agree with Wilder that the statements contained in the 911 tape recording were testimonial in nature. Unlike the caller in Davis, Madison was not "call[ing] for help against a bona fide physical threat." 547 U.S. at 827. In fact, Madison acknowledged during the call that Wilder and Brooks did not see him. Nor was there evidence in the record suggesting that the actions of Wilder and Brooks represented a danger to others. Although Madison was describing events "as they were actually happening," the facts in this record do not demonstrate that he "fac[ed] an ongoing emergency that called for help." Cadieux, 500 F.3d at 41. In reaching this conclusion, we note that in every other federal and state case that has previously confronted this issue and found the challenged statement to be nontestimonial, the facts and circumstances of the case indicated an immediate or imminent danger to the declarant, a third person or the public generally.

---

[5] It is important to note that while the Supreme Court relied on these factors in assessing whether the 911 call in Davis was testimonial, the Court did not assign them any individual weight. Therefore, the presence or absence of one or more factors is not necessarily dispositive.

- 10 -

For example, in Caison, the defendant stabbed the victim in the presence of a witness. After the defendant fled the scene, the witness called 911. At trial, a recording of the call was admitted into evidence over the defendant's objection. This Court held that the recording was nontestimonial and affirmed the trial court. We stated that the ongoing emergency in that case was "manifested by two sources of distress: [the victim's] life-threatening condition and the present and proximate danger that appellant, a potentially armed assailant who had stabbed [the victim] and fled into the neighborhood, would return to the scene . . . ." Caison, 52 Va. App. at 436, 663 S.E.2d at 559.

Similarly, in Proctor, the defendant's brother, Yogi, called 911 to report that the defendant had taken a gun from his car, fired it into the ground, and then fled into a nearby nightclub. During the call, Yogi indicated that the defendant was a convicted felon, who was possibly high on cocaine. At trial, a recording of the 911 call was admitted into evidence over the defendant's objection. The Court of Appeals for the Fifth Circuit held that the 911 recording was nontestimonial and affirmed the defendant's convictions. The court found that an armed, potentially dangerous felon, possibly high on cocaine, who ran into a nightclub constituted an ongoing emergency that required police assistance. Proctor, 303 F.3d at 371-72. As the court noted, the caller "could have reasonably feared that the people inside the nightclub were in danger." Id. at 372.

In Cadieux, the defendant, who was extremely intoxicated, brandished a shotgun during an argument with his girlfriend. When the girlfriend's daughter returned home, she became concerned and called 911. Eventually, the police arrived and apprehended the defendant, who happened to be a convicted felon. At trial, a recording of the 911 call was admitted into evidence over the defendant's objection. On appeal, the Court of Appeals for the First Circuit held that the recording was nontestimonial. The court recognized that "[t]he emergency did not end until

Cadieux was apprehended . . . ." Cadieux, 500 F.3d at 41. Furthermore, the court noted that the caller was "hysterical as she sp[oke] to the dispatcher, in an environment that [was] neither tranquil nor, as far as the dispatcher could reasonably tell, safe." Id.

Unlike Caison, Proctor, or Cadieux the record in this case lacks any evidence to suggest that Wilder posed such a danger to Madison or anyone else.[6] Nor does the recording indicate that Madison was frantic or in an unsafe environment. In fact, prior to calling 911, Madison attempted to call the offices of B&H Sales Corporation. Had Madison viewed the circumstances as dangerous or unsafe for him or anyone else, it is unlikely that his first call would have been to the company. Instead, Madison called 911 and calmly provided a narrative report of a larceny in progress. The mere fact that Madison communicated his information through a call to the 911 police emergency number did not transform the situation into an emergency for purposes of Davis. As the Supreme Court recognized, "one *might* call 911 to provide a narrative report of a crime absent any imminent danger . . . ." Davis, 547 U.S. at 828. That is precisely what occurred in this case.

Because Madison was not facing an "ongoing emergency," but was instead merely providing a narrative report of a larceny in progress, we hold that the tape recording of his 911 call was "testimonial" within the meaning of the Confrontation Clause. Thus, its admission violated Wilder's rights under the Sixth Amendment.

---

[6] Courts from other jurisdictions have held that dangers to the public constitute an "ongoing emergency" for purposes of the Davis analysis. See Key v. State, 657 S.E.2d 273 (Ga. Ct. App. 2008) (holding that a 911 call to report the erratic driving of the defendant was nontestimonial as its primary purpose was to "prevent harm to the public"); see also Cook v. State, 199 S.W.3d 495 (Tex. Crim. App. 2006). But see Pitts v. State, 627 S.E.2d 17 (Ga. 2006) (holding that a telephone call is nontestimonial when "made to avert a crime in progress or to seek assistance in a situation involving immediate danger").

III. <u>Sufficiency of the Evidence</u>

Although we reverse his conviction on constitutional grounds, we address Wilder's sufficiency argument in order to ensure that a retrial on remand will not violate double jeopardy principles: "If the evidence adduced at trial was insufficient to convict [Wilder], he is entitled to an acquittal; if he is so entitled, a remand for retrial would violate the Constitution's prohibition against double jeopardy." <u>Parsons v. Commonwealth</u>, 32 Va. App. 576, 581, 529 S.E.2d 810, 812-13 (2000). "However, when assessing the sufficiency of the evidence on appeal, 'we consider all admitted evidence, including illegally admitted evidence.'" <u>Sprouse v. Commonwealth</u>, 53 Va. App. 488, 493, 673 S.E.2d 481, 483 (2009) (quoting <u>Hargraves v. Commonwealth</u>, 37 Va. App. 299, 312-13, 557 S.E.2d 737, 743 (2002)). Therefore, we must consider the 911 tape recording in our sufficiency analysis.

At the close of the Commonwealth's case-in-chief, Wilder made a motion to strike the evidence as insufficient to prove, beyond a reasonable doubt, that Wilder took the stolen property and that the value of the stolen property exceeded $200, the statutory threshold for grand larceny. However, Wilder did not renew this motion at the close of all the evidence. Later, after the jury found Wilder guilty, he made a motion to set aside the verdict, "against the weight of the evidence." The trial court overruled Wilder's motion.

We have previously stated that "'a defendant is barred on appeal from challenging the sufficiency of the evidence when he fails to renew his motion to strike the evidence after presenting his case.'" <u>McQuinn v. Commonwealth</u>, 20 Va. App. 753, 756, 460 S.E.2d 624, 626 (1995) (*en banc*) (quoting <u>White v. Commonwealth</u>, 3 Va. App. 231, 234, 348 S.E.2d 866, 868 (1986)). However, through his motion to set aside the verdict, Wilder could have properly preserved his sufficiency argument provided he stated the argument with "sufficient particularity to submit that issue to the trial court." <u>Day v. Commonwealth</u>, 12 Va. App. 1078, 1079, 407

S.E.2d 52, 54 (1991). Assuming without deciding that Wilder's motion to set aside the verdict as "against the weight of the evidence" was sufficiently specific to preserve his sufficiency argument on appeal, we hold that the evidence adduced at trial is sufficient to sustain Wilder's conviction for grand larceny.

"When considering a challenge to the sufficiency of the evidence on appeal, a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Clanton v. Commonwealth, 53 Va. App. 561, 566, 673 S.E.2d 904, 906 (2009) (*en banc*) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)) (emphasis in original). "Instead, we ask only 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. at 566, 673 S.E.2d at 906-07 (quoting Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. Although, "a factfinder cannot arbitrarily disregard a reasonable hypothesis of innocence," Cooper v. Commonwealth, 54 Va. App. 558, 573, 680 S.E.2d 361, 368 (2009), "whether the hypothesis of innocence is reasonable is itself a 'question of fact,'" Clanton, 53 Va. App. at 572, 673 S.E.2d at 910 (citations omitted). "'Merely because defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded.'" Id. (quoting Miles v. Commonwealth, 205 Va. 462, 467, 138 S.E.2d 22, 27 (1964)). Thus, the jury's determination in this case could only be overturned if "no rational fact finder would have come to that conclusion." Haskins v. Commonwealth, 44 Va. App. 1, 9, 602 S.E.2d 402, 406 (2004).

In this case, the evidence established that Madison observed two men break into a stockyard owned by B&H Sales Corporation and steal a large container of metal, "machinery type" objects. Madison then called 911 and described to the dispatch operator what he observed. Matthews and Rodriguez received this information and located two individuals matching the description given in the dispatch. The individuals, later identified as Wilder and Brooks, were pushing a large bin, containing the stolen machinery. Coleman, the owner of B&H Sales Corporation, was able to identify the stolen property, and Johnson, a tenant of Coleman, testified that the value of the stolen property was around $3,900, well above the statutory threshold. Wilder, a convicted perjurer, testified that he was on his way home from the pharmacy when he encountered Brooks pushing a cart and agreed to help Brooks sell the cart's contents for scrap at the junkyard. Though Wilder's testimony provided an alternative account of his involvement, the jury was free to reject Wilder's testimony and find him guilty. As fact finder, the jury "is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998). Therefore, we hold that, with the 911 tape recording, the evidence in the record is sufficient to sustain Wilder's conviction for grand larceny.

CONCLUSION

Although the 911 tape recording was admissible under the present sense impression exception to the hearsay rule, we hold that the recording was testimonial under the United States Supreme Court's analysis in Davis, and its admission violated Wilder's Sixth Amendment right

to confrontation.  Therefore, we reverse Wilder's conviction and remand for a new trial should the Commonwealth be so advised.[7]

Reversed and remanded.

---

[7] The issue this Court must resolve in a case such as this is whether the evidence *actually presented* is sufficient as a matter of law, not whether the evidence that should have been presented is sufficient.  As the United States Supreme Court explained in Lockhart v. Nelson, 488 U.S. 33 (1988), retrial is appropriate and does not offend double jeopardy principles if the evidence, *including* that which was improperly admitted, is sufficient as a matter of law.  Furthermore, if the evidence presented, whether erroneously admitted or not, is legally sufficient, remand to the trial court for a retrial without the improperly admitted evidence is constitutionally appropriate because to do so is consistent with separation of powers principles.  "Because reversal for insufficiency of the evidence is equivalent to a judgment of acquittal, such a reversal bars a retrial.  To make the analogy complete between a reversal for insufficiency of the evidence and the trial court's granting a judgment of acquittal, a reviewing court must consider all of the evidence admitted by the trial court, regardless whether that evidence was admitted erroneously."  McDaniel v. Brown (USSC Jan. 11, 2010) (per curiam) (internal citations omitted).  By remanding for a new trial without the improperly admitted evidence if the Commonwealth is so advised, we acknowledge that, where retrial is not barred by a double jeopardy analysis, any decision concerning whether retrial is appropriate without the improperly admitted evidence is, barring a finding of prosecutorial vindictiveness, properly the province of the executive branch of government rather than the judicial branch.  See Oregon v. Kennedy, 456 U.S. 667, 672 (1982) ("The Double Jeopardy Clause . . . does not offer a guarantee to the defendant that the State will vindicate its societal interest in the enforcement of the criminal laws in one proceeding."); see also United States v. Tateo, 377 U.S. 463, 466 (1964) ("Corresponding to the right of an accused to be given a fair trial is the societal interest in punishing one whose guilt is clear after he has obtained such a trial.  It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction.  From the standpoint of a defendant, it is at least doubtful that appellate courts would be as zealous as they now are in protecting against the effects of improprieties at the trial or pretrial stage if they knew that reversal of a conviction would put the accused irrevocably beyond the reach of further prosecution.  In reality, therefore, the practice of retrial serves defendants' rights as well as society's interest.").